# No. 12,668.

STATE BOARD OF DENTAL EXAMINERS ET AL. *v.* MILLER.

(8 P. [2d] 699)

Decided January 18, 1932. Rehearing denied February 23, 1932.

Mr. John L. Underwood, Attorney General, Mr. Clarence L. Ireland, Attorney General, Mr. Arthur L. Olson, Assistant, Mr. Charles H. Haines, Special Assistant, for plaintiffs in error.

Mr. Horace N. Hawkins, Mr. Edward L. Wood, Mr. J. C. Stevenson, for defendant in error.

*En Banc.*

Mr. Chief Justice Adams delivered the opinion of the court.

This case concerns the revocation by the state board of dental examiners of the licenses of the following dentists to practice their profession in the State of Colorado: Doctors John H. Miller, Charles W. Patch and Joseph R. Walsh. They took the matter to the district court for review on writs of certiorari. The court reversed the action of the board, and the board and its members bring error to review the judgment of the court. The opinion herein should be read in connection with No. 12,666, *State Board of Dental Examiners v. Savelle,* 90 Colo. 177, 8 P. (2d) 693. When not otherwise designated we shall refer to the state board of dental examiners and its members (plaintiffs in error) in their official capacity as the board, or dental board, and Miller, Patch and Walsh (the defendants in error) as the dentists.

The substance of the charge against the accused dentists, sustained by the board, is that such dentists were guilty of unprofessional and dishonorable conduct and

gross violation of their professional duties in the following particulars:

(1) Miller and Walsh accepted employment and practiced dentistry under Painless Parker Dentist, a California corporation, not licensed and not entitled to a license to practice dentistry in this state. The time that this alleged offense was committed was before such practice had been declared unlawful, in *People v. Painless Parker Dentist*, 85 Colo. 304, 275 Pac. 928.

(2) Miller, Patch and Walsh accepted employment and practiced dentistry either under Painless Parker Dentist (hereinafter called the painless company) or its successor, The Parker Dental System Company, a Delaware corporation (hereinafter called the system company), not licensed and not entitled to a license to practice dentistry in this state. This alleged offense was committed after this court had declared such practice to be unlawful.

(3) Miller, Patch and Walsh knowingly aided and abetted the system company in unlawfully practicing dentistry in Colorado.

(4) Miller conducted the dental business in his own name or in the name of J. H. Miller and associates, for the purpose of concealing the fact that the system company had an interest in, and partial or entire control and management of, said business.

(5) Miller, Patch and Walsh had, for the purpose of attracting patronage, used false and misleading advertisements, stating that they used the "E. R. Parker System," intending to convey the idea that it was a superior system of dentistry, whereas there was no such thing as the "E. R. Parker System" of dentistry.

We shall comment, as briefly as possible, on some phases of the evidence, under two general topics, first, as to the corporation feature of the practice of dentistry, and second, as to methods of advertising. Counsel for the dentists claim that the system company is not so practicing, but the attorneys for the board assert that

such company is doing so by circumlocution, aided and abetted by the three dentists here involved.

The following excerpts from the evidence are on the issue thus tendered:

Exhibit 2 is a certified copy of the articles of incorporation of the system company in Delaware. Its objects and purposes, among other things, are as follows:

"To provide clinics, consultation rooms and other facilities for proper dental and surgical attendance, and medicine and all other things and appliances of a dental and surgical character.

"To provide accommodation for the treatment and care of patients.

"To employ physicians, dentists and surgeons who shall carry on the practice of medicine, dentistry and surgery."

Miller conducts the Denver dental offices; Patch and Walsh are his assistants. They sometimes go by the name of "Dr. J. H. Miller and Associates," and the three perform the dental work of the office. Two instruments in writing purport to show the agreement between the system company and Miller. They are both dated January 1, 1929; one of them is called a "lease," with the company as lessor and Miller as lessee; the other is denominated a "license," with the company as licensor and Miller as licensee. It appears that they are similar to numerous other agreements between the system company and dentists in other states.

In some way the system company acquired the lease on the premises in Denver, formerly occupied for dental purposes by the painless company, and now used by the accused dentists, either for themselves or the system company, as the case may be. The latter then leased or sublet the premises, together with dental equipment and fixtures, to Miller, under the instrument first above mentioned, at an annual rental of $1,800, payable in equal monthly installments. The system company also claims to own the "E. R. Parker System," whatever it may be.

Under the "license," Miller is granted the exclusive right to the use of the "system" in Colorado, for a consideration of $4,200 per annum, also payable in equal monthly installments. The "license" also requires Miller to buy all of his dental supplies and dental equipment from the system company; it reserves the right of inspection of the dental offices, provides for advertising the "system" under the espionage of the company, the company to furnish "advertising copy" and instructions as to the use of the "system" on request of the "licensee." Both the "lease" and "license" contain strict covenants of forfeiture.

Miller admitted that all his gross receipts from his dental practice had been deposited daily or oftener to the credit of the system company, which had its principal office in California, and that no one but its officers in that state had authority to draw checks against the account. Provision for salaries and local expenses was made by sending checks to Colorado from the California office of the system company. Miller further admitted that at the end of the year he could not tell whether he owed the company or the company owed him.

As to the theory of the defendant dentists as to what the "E. R. Parker System" means, we quote a part of the testimony of French, not a dentist, but business manager and director of the system company: "It [the system] is not a system of dentistry. Don't understand the E. R. Parker System as being a system of dentistry. It is just simply the E. R. Parker System. Q. Of bookkeeping? A. Of many things. Q. Business administration? Business administration, and preparations for grouping these things together in one place, and providing departments and operating offices and equipment for them, the standardization of the equipment, instruments, the standardization of all blanks, and methods, as I have stated before—certain methods of procedure in dentistry. There is the peridental system that goes in with it, and the method of handling the patient in the

chair, the method of handling the patient from the time that he is received in the office until he is finally finished. All of those things combined to make what is known as the E. R. Parker System, together with a definite group of offices, all working under one united plan, in various cities. That is the system, the same as the Union Pacific System, or the Burlington System, or the Harriman System—used in that sense. That is part of the system."

Methods of advertising consisted of public exhibitions, newspaper advertisements, handbills, circular letters, a large Parker sign over each of the two Denver dental offices; signs on the stairways and office doors, all or nearly all of which contain a uniform emblem in the form of a crest or shield, with the words "E. R. Parker System" thereon. Miller's name is printed on some of them as using the system, and none of the accused dentists deny their connection with it.

The Parker system is the conspicuous and predominant idea conveyed in all advertisements. Miller heralds it variously as "Common Sense Dentistry," "Famous for Painless Dentistry," etc. He advertises also that "It means that you are getting better work for less money because dentists using this system do their work painlessly—enabling them to save time, which lowers the cost—do more and better work. * * * at a price you will enjoy paying." Miller further advertises, "Dentists using the E. R. Parker System are able to make their prices so low that only dentists using the same system can meet them."

One Miller advertisement proclaims that there are "Over a million satisfied patients" under the E. R. Parker System. As against this, it sufficiently appears that some of its methods are discredited and considered obsolete, and not generally practiced by the profession. A Denver physician and surgeon testified that he had been called to the Parker dental offices thirty or forty times to treat patients operated upon under the "system," about fifteen of them for cocaine poisoning; three of the patients had infections extending down into the jaw and

into the neck; the three went to the hospital and nearly died as a result of foreign material or infection injected with medicine through the needle. These calamities are not attributed to operations performed by the dentists at present involved; they are offered in opposition to the claim of a superior system of dentistry in the Parker offices.

The evidence further shows that one Dr. Jorgensen, a Parker attache of its Denver offices under the painless company's former management, assisted by a Parker tout, made a blatant speech before a crowd at the stadium of the Denver stockyards; that Jorgensen or his associate "yelled and shouted" and accused the dental profession at large of being robbers, and that Jorgensen and his helper conducted a demonstration with false and misleading statements and exhibitions, pretending to show the alleged superiority of the Parker system over all others.

For convenience, we have transposed the order in which the above charges appear in the findings of the board and in the briefs, and for similar reasons have changed the arrangement of the objections that follow:

Counsel for the dentists urge that the action of the district court in restoring the licenses of such dentists should be sustained on the following alleged grounds: (a) The statute providing for the revocation of a dental license for "gross violation of professional duties" is unconstitutional and void for uncertainty; (b) the charges were insufficient to constitute a "gross violation of professional duties"; (c) the board was disqualified to act by reason of the bias and prejudice of its members; (d) there was no sufficient or legal evidence to support the charges or the findings.

1. Taking the above in their order, the objection (a) that the statute is void for uncertainty, is untenable. *Dillard v. State Board of Medical Examiners,* 69 Colo. 575, 196 Pac. 866; *State Board of Dental Examiners v. Savelle, supra,* and cases there cited; *State v. Purl,* 228 Mo. 1, 128 S. W. 196.

██ 2. Objection (b) that the charges are insufficient, which is in the nature of a general demurrer to the complaint or information, must be also overruled under the authority of the Savelle case. That decision pertains particularly to the charges above mentioned concerning the practice of dentistry through the medium of a corporation or corporations, but the general principles there discussed as to false and misleading representations upon the part of professional men are equally applicable to this case. It should need no further demonstration to convince anyone that such species of fraud upon the public constitute gross violations of professional duty. Each of the five charges above enumerated states a good cause of action.

██ 3. Objection (c) is a plea of recusation, as to the alleged disqualification of the dental examiners. It is based upon the fact some of them are members of the Colorado State Dental Association, at whose instance the actions were prosecuted. Such membership does not disqualify them. An analogy may be found in the situation of the American Bar Association or Colorado Bar Association, formed for the advancement of jurisprudence and the promotion of the highest interests of the legal profession in its relation to society. It is not to be supposed that membership in such association disqualifies a judge to sit in disciplinary proceedings against lawyers, although it not infrequently happens that state bar associations or their grievance committees appear as relators. It is only natural that they should do so. We find nothing to warrant the supposition that the dental examiners were biased or prejudiced against any of the accused. The fact that such examiners are undoubtedly in favor of law enforcement, like all good citizens, is essential to their usefulness on the board. The plea of recusation is not well taken.

██ 4. Further, as to the claim that the Colorado State Dental Association was back of the prosecution, such public service, though tedious, was necessary. Who-

ever started it, the system company and its employes led their pursuers across the continent from Delaware to California. The case started and ended at the dental offices in question on Fifteenth street in Denver, and notwithstanding the flight of the defendants, they cannot escape the force of the old and virile maxim that an act which cannot be done directly because illegal, cannot be done indirectly. This principle is a buckler against subterfuge.

5. Concerning objection (d) as to the sufficiency of the evidence, we do not wish to be unnecessarily harsh, and intend no reflection upon eminent counsel for the defendants. These attorneys took the case as they found it; they ably represented their clients, but justice demands a candid analysis. It has been solicited from us and cannot be avoided. To summarize the above evidence, the elaborate methods ingeniously employed by the system company to practice dentistry by proxy would be comical if they were not so serious. We are convinced that the so-called "lease" and "license" to Miller are only palpable shams to evade the effect of our decision in the Painless Parker Dentist case in the 85th Colorado reports. These inventions did not stem the tide of gold derived from the practice of dentistry, into the coffers of the supply company; they simply unloosed the floodgates into its treasury.

6. As to the subtle suggestion that the supply company is Miller's "landlord," it intrigues our imagination to suppose that Miller or anyone would employ the columns of the public press and broadcast handbills just to panegyrize a beneficent landlord. By contract, even the literature is provided or examined in advance by the latter, and the "lease" may be cancelled for any breach of covenant. It is also a novelty for a tenant, on a stipulated monthly rental, to systematically make daily deposits in bank of his gross receipts, in whatever amount, to the credit of his landlord, and not be allowed to check on the account. We are convinced from this and other

facts that the relationship of landlord and tenant, in the common acceptance of the term, did not actually exist.

7. It is too much of a task to believe that Miller would pay the supply company the sum of $4,200 per annum for the use of its system or the motto, "E. R. Parker System." It would seem from the evidence that many reputable dental practitioners, including the examiners, regard the phrase as a badge of obloquy, which they would not accept as a gift. The examiners, after an exhaustive hearing, have unanimously repudiated such emblem upon behalf of their profession and the public at large. We are unable to say that they are wrong. In one way, the insignia serves a useful purpose to the court. It appears in the nature of a trademark, indelibly stamped upon all of the deeds of the accused dentists, and inseparably identifies them with the Parker unit. Light may be acquired from another angle. In this state, as in others, reasonable latitude is allowed practitioners for the diversity of teaching in accredited schools of thought, an allowance that finds its way into many legislative acts. No one, however, can believe that a diploma from the Parker Dental Supply Company, supervised by a layman, would entitle a candidate to practice dentistry, nor to continue in it. It would seem that the dentists discredit their own alma mater by boasting of a post graduate course with an outlaw foreign corporation, and of their adherence to its doctrines. The representations to the public that it is something worth while, except as an avenue of wealth, is contradicted by the record. Commercially, the loan of the good names and professional reputations of the dentists or of other licensed practitioners to the supply company, was indispensable to the charter purposes of the latter. On the other hand, the dentists, if competent, needed no alias or the Parker fetish as a means of gaining their livelihood. The bartering of their certificates to the supply company was void because contrary to statute and against public policy. *State Board of Dental Examiners v. Savelle,*

*supra.* We are convinced that Miller's agreement, under the guise of a license, to pay the supply company $4,200 per annum for the use of its "system," was only one of the devious methods used to insure the company its full measure of profits from the practice of dentistry in Colorado. As to the "book of directions" furnished by the company, if a graduate physician or lawyer had to pay that much money every year for the perusal of one text book telling him how to succeed, there are those who might question the efficacy of his preparation for professional life.

The Parker pretensions have carried us into wearisome labyrinths to elicit the truth, but another significant fact must be mentioned. Legally, there is no such person as E. R. Parker, whose "system" the defendants exalt. Parker voluntarily exchanged his fine baptismal name of "Edgar Randolph," for the euphonius title of "Painless," on his application to a court of a sister state. Whether he did it for business reasons or for decorative purposes, the title of "E. R. Parker" on defendant's literature is a misnomer, as is also "Painless," in a literal sense.

8. We gather from the record that pain is an attribute of the flesh from which there is no escape in many cases, particularly when its elimination may endanger life. Many Parker patients have not avoided it. It cannot be denied that pain is a merciful provision of nature, indispensable to diagnosticians, to indicate the locus of a disease or injury. The psychology of the Parker advertisements is that animate beings naturally shrink from pain, and men and women will "enjoy paying" their price for eradicating it. The suggestion is made even more attractive to the unwary by the statement that those using other systems cannot afford to make their prices so low. The suggestion contained in the advertisements that painless dentistry is a peculiar quality of such system, denied to less favored members of the profession, or that it is possessed by the latter in a lesser

degree, is an unwarranted affront to all humane and intelligent dentists, and a misrepresentation not to be justified. It is said to be a fact of history that anaesthetization was practiced by the Egyptians. Be that as it may, the record shows that magazines are filled with advertisements of supply houses advocating various modern anaesthetics, from which dentists select those that experience has demonstrated to be the best, and no one is denied these boons. To say the least, the profession at large knows as well as the Parker followers how and when to use them, and they are not dependent upon Parker chemists.

9. Some of the authorities under which physicians or dentists were deprived of their licenses are collated in the Savelle case, this day decided. To these we add *Re Washington,* 23 Ont. Rep. 299. In that case Dr. Washington advertised, among other things, that ''He does not claim to cure all patients who consult him, but he does claim to cure a much larger percentage than the general practitioners in general practice. It is not an unreasonable claim either, when it is considered that the doctor has devoted seven years to the study of the specialty, and improved on all the new systems which have been before the scientific world. His treatment has risen superior in its effects and results to that adopted by the most eminent specialists even in New York,'' etc. He failed to use expressions like those contained in the Miller advertisements, such as ''Common Sense Dentistry,'' (as though all other systems were foolish) or ''Famous for Painless Dentistry,'' (when some of the patients had to be taken to the hospital) or ''Over a Million Satisfied Patients,'' or that the work was guaranteed by dentists using the system, etc. Nevertheless, in the Washington case, the doctor's inordinate boast of superior skill, which caused him to lose his license, was not dissimilar in purport to the advertisements contained in the present record. In the Washington decision, the court hinted, ''If this did not come up to the crime of obtaining money under false

pretenses, it came perilously near to it.'' And further, ''It was certainly conduct disgraceful in the common judgment of mankind, and much more so in a professional respect.'' These words are appropriate to the present case.

In *Dillard v. State Board of Medical Examiners, supra,* a physician's license was revoked because he held out to *one* woman that a certain man was a trained and skilled physician and surgeon when he was not, and caused the patient to submit to his treatment. Here we have representations made to countless thousands, advocating the panaceas of a nonexistent or misnamed individual, claimed to be a paragon in dental therapeutics.

10. We do not load Miller, Patch and Walsh with personal accountability for certain mistakes of other votaries of the Parker system, such as the disgraceful Jorgensen episode above related, nor for administering cocaine, condemned by the profession and discountenanced by Miller himself, nor for the poisoning of patients with infected needles. These incidents go to the merits of the promises versus the performances of some of the employes under the ''system.'' They also illustrate the evils of permitting an unlicensed corporation, subject to its own whims, to engage in the practice of a healing art by hiring subordinates. Such evidence confirms our judgment that the act to regulate the practice of dentistry is fundamentally sound, and that our decision in *People v. Painless Parker Dentist, supra,* is right.

11. It is true that the written agreements with the system company were made in Miller's name, and such was generally the case with the advertisements, but the Parker name is emblazoned conspicuously through the dental offices where Miller, as well as Patch and Walsh, practice dentistry. Such offices are headquarters in this state, for the dissemination of literature of the system. French's perhaps unintentionally graphic comparison was that it was like a gigantic railroad system. The three dentists named are old followers of the Parker

rails, and it is impossible to believe that any of them were oblivious to their daily office surroundings, or the source of their checks or incomes. It would be as idle to say that they are not an integral part of the system, as it would be to claim that the hands and feet are not a part of the body. We conclude that all of the five charges are amply sustained by the evidence; that the dental board was correct in finding the dentists guilty of gross professional misconduct, and that the board did not exceed its powers or abuse its discretion. The offenses of the dentists were by no means minimized by their persistence in their unlawful practices, after our decision in the Painless Parker Dentist case.

12. Session Laws 1929, chapter 74, pages 287, 288, relating to foreign corporations, amends sections 2307 and 2321, C. L. 1921. The latter section as amended, requires, among other things, that foreign corporations doing business in Colorado shall file in the office of the secretary of state a copy of their charter of incorporation. The record fails to show that the supply company has made any effort to comply with the act. Whether it does it or not, it cannot get a license to practice the profession of dentistry in this state, nor to hire others for such purpose. By way of exclusion from the intendment of this opinion, we remark that the charter of the supply company discloses that it has other objects, inherently legitimate, such as the marketing of dental supplies. Its right or claim of right to the pursuit of such business is not involved in any of the five dental cases now before us.

For the reasons hereinabove stated, the judgment of the district court is reversed and the cause remanded with instructions to set aside its judgment and in lieu thereof to enter a judgment dismissing the writ of certiorari at the cost of Miller, the petitioner therein.

MR. JUSTICE HILLIARD not participating for the reasons stated in *State Board of Dental Examiners v. Savelle, supra.*